[Civ. No. 2540.    First Appellate District.—October 4, 1918.]

MAY L. WATERS, Respondent, v. CONSELHO SUPREMO DA UNIAO PORTUGUEZA DO ESTADO DE CALIFORNIA (a Corporation), Defendant; ROSA REX, Appellant.

FRATERNAL INSURANCE — CHANGE OF BENEFICIARY — MENTAL INCOMPETENCY OF INSURED—SUFFICIENCY OF EVIDENCE.—In this action to cancel a certain certificate of insurance issued by a fraternal insurance society and to declare a prior policy in full force and effect, upon the ground that at the time the new policy was issued and the consequent change of beneficiaries was made thereby, the insured was of unsound mind, and, therefore, incapable of making a valid designation of a beneficiary, the evidence is examined and held sufficient to sustain a finding of the mental incompetency of the insured at the time.

APPEAL from a judgment of the Superior Court of Alameda County. William H. Waste, Judge.

The facts are stated in the opinion of the court.

L. Gonsalves, for Appellant.

L. A. Kottinger and Milton Shepardson, for Respondent.

THE COURT.—This was an action brought by respondent to cancel a certain certificate of insurance issued by a fraternal insurance society operating under the provisions of the Fraternal Act of 1911 (Stats. 1911, p. 1320), and to declare a prior policy to be in force and effect. The complaint

alleges that respondent is the surviving wife of the insured, Antone E. Waters; that she acquired a vested right in the prior insurance policy by reason of certain agreements or understandings between herself and her husband at that time and by reason of her conduct thereafter with reference to the policy; that thereafter in 1913 the insured delivered up his policy to be canceled, that it was canceled, and a new policy— the one in suit designating the appellant as beneficiary— issued; that the issuance of the new policy, of which the appellant, a sister of the deceased, was made the beneficiary, was brought about through fraud and undue influence practiced upon deceased by appellant, and that at the time of the issuance of the new policy and consequent change of beneficiary deceased was of unsound mind and incapable of making a valid designation of beneficiary for that reason.

The court found each and all the allegations of the complaint to be true and supported by competent evidence, although it may be stated at the outset that there is no evidence in support of the allegations of fraud and undue influence.

The conclusion we have reached on the merits of the case renders unnecessary a determination of respondent's motion to dismiss the appeal; and for the same reason it will be unnecessary for us to consider the question whether or not the wife, having in accordance with an agreement with her husband paid the dues upon the policy as long as the fraternal society would accept them, with the understanding that she should be the beneficiary thereof, acquired a vested interest in the policy.

It is the contention of the appellant that the evidence in the case is insufficient to support the finding of mental incompetency. We are of the opinion that this contention is not maintainable, and that there is an abundance of evidence in the record that Waters was permanently insane prior to the time that he made the change of beneficiary in question.

The evidence shows that before the year 1907 Antone E. Waters was a shrewd business man, a carpenter by trade, a good mechanic, and was very bright and intelligent. In the year 1907 he suffered a fit of epilepsy. The epilepsy was caused by a cyst or tumor on the brain, and finally resulted in his death on December 21, 1914. Dr. Harris, the managing physician in charge of the county hospital where he died, stated it as his opinion that Waters was permanently insane

as far back as January, 1912. The tumor was large and would necessarily result fatally, and would permanently impair his mental and reasoning faculties. It would result in epilepsy. The paroxysms would increase in frequency with the growth of the tumor, and correspondingly the brain cells would disintegrate, and mental degeneracy would gradually take place. The doctor stated that many medical writers agree that such a patient would never be mentally normal or sane after the first severe paroxysm; and he stated that the tumor disclosed by the autopsy held by him was about the size of a plum, and that it required several years to develop, and would cause blindness, and in his opinion a person with such a tumor would be mentally unbalanced for six years previous to his death. Waters was totally blind when he was admitted to the hospital on February 6, 1914, and at that time was mentally unbalanced, and in the opinion of the doctor on May 4, 1913, Waters was not competent to transact any business in an intelligent manner. The tumor affected the motor cells and the mentality, and would render Waters incompetent and unbalanced for several years. After Waters became the subject of epileptic attacks intimate acquaintances testified that they were of the opinion that after the year 1907 he was insane. Apparently insanity was congenital with him, his mother being an inmate of the Napa State Hospital, an aunt being insane, and his brother Manuel simple-minded.

During the years 1907 and 1908 Waters was the subject of epileptic attacks. In 1907 he fell on the street, three teeth being knocked out. He would occasionally have two or three fits a day. At such times he would foam at the mouth and stiffen out, would fall to the ground, turn black in the face and have a glassy stare, his muscles would become rigid, and he had great difficulty in breathing; his face would sometimes take on a purple hue and apparently he was in a bad condition. After he became subject to these fits he would sit for long periods staring at the sidewalk. He would gaze at an object before him for hours and seemed as if in a trance. His wearing apparel became filthy; his habits of industry left him; he became slovenly in his person, which the doctor testified is a symptom of the disease. He would not permit his wearing apparel to be washed, though filthy. He became very bitter against his little girls, nine or ten years of age,

and against his wife without cause. He would seldom speak
to them, although he talked with others. After the first
epileptic fit in 1907 Waters gradually became more slovenly
in his habits, dress, and personal appearance, and his hatred
toward his wife and children increased in intensity, until in
1912 his wife became afraid to longer live with him. He
would swear at the children and threw a shoe at and cut
one of them; he threw a knife at his wife. He placed a
powder on some grapes and melons intended for the family's
use, but which being fed to the chickens killed them. He
poured something in his wife's coffee which tasted like car-
bolic acid, and laughed when he saw her pour the coffee.
He tried to burn his suit of clothes, and exhibited it to the
public with a sign written on a slab attached to it reading:
"This $18 suit on exhibit by Mrs. Waters bought over one
and a half years ago." When his wife asked for money,
which it appears he was able to furnish, he tried to throw
her downstairs. He would not support his wife and children,
and the former had to take in sewing for a living. At times,
though the door was unlocked, he would sneak in the back
way and climb over the roof of the house and let himself
in through an upper window. At Benicia, Waters made his
appearance ragged, tattered, and torn. He shook like a leaf
and had an unusual stare. In November, 1912, he talked in
a rambling and incoherent way and had an unnatural laugh.
His eyes became badly afflicted in 1910 and grew worse until
in 1913 he became totally blind. Charles Taylor knew Waters
intimately for years, and testified to his opinion that Waters
was insane before May of 1913. He would hide in his chil-
dren's playhouse or under the steps. He would leave his
family for three months at a time without explanation. The
witness Dana knew the deceased fifteen years. He visited
the witness three or four times and on those occasions acted
as though he did not know him, and had a look in his face
which caused Dana to form the opinion that he was crazy.
Other testimony was to the effect that in the lodge-room he
acted as though he was drunk, waved his arms, and turned
around, but had no odor of liquor about him. He did not
seem to know how to get out of the lodge-room when ready
to leave. To another witness, Frank Joseph, he appeared to
be insane at the time he was endeavoring to have the lodge
change the policy. His agent was afraid of him. In the

latter part of 1912 the witness Jerry Wade met Waters on the street where Waters was attracting a crowd by silently gazing at an upper window. Wade greeted him, and Waters replied, ''Who are you talking to? I don't remember you.'' Wade stated who he was, and Waters replied, ''You are the fellow I tried to buy the tannery from in Benicia,''—which was not the fact. Wade formed the opinion that he was insane.

It may be true that there is evidence in the record from which one might conclude that Waters was suffering only from a mental delusion which did not operate to produce the change of beneficiary attacked in this action, but it certainly cannot be said that there was no evidence that he was insane at that time. Two witnesses testified directly to that effect, and the same conclusion can reasonably be drawn from the testimony of eight other witnesses. We think it follows that the finding of the court upon this issue is sustained by the evidence.

Appellant appears to contend that because the wife of Waters in a divorce proceeding entered into an agreement with her husband by which their property rights were settled, at a time when according to her testimony and claim in this case he was permanently insane, she waived any rights she may have had under the policy of fraternal insurance. We think the insurance did not constitute a claim against Waters which was affected by the divorce settlement, but was one which had been arranged between them previously. However that may be, the question to be decided in this proceeding was as to the condition of Waters' mind when he procured the change of beneficiary; and the circumstance that the respondent dealt with him three months prior thereto in the settlement of their property rights as if he were a sane man affected only her credibility as a witness.

The judgment is affirmed.